FRANK MONTALVO, UNITED STATES DISTRICT JUDGE
This case results from an appeal of an arbitration decision following an arbitration proceeding convened to address the applicability of the Randolph-Sheppard Act to a contract for supporting cafeteria services at Fort Bliss. Before the court are "Defendant's Partial Motion to Dismiss, or in the Alternative, Partial Motion for Summary Judgment, and Partial Motion to Remand Plaintiff's Amended Complaint" (respectively "Motion to Dismiss," "Motion for Summary Judgment," and "Motion to Remand")[1] [ECF No. 39], filed July 16, 2018 by the United States Department of Education, Rehabilitation Services Administration ("Defendant"), on behalf of the United States Department of the Army[2] ; "Plaintiff's Response to Defendant's Partial Motion to Dismiss, Partial Motion for Summary Judgment, and Partial Motion to Remand Plaintiff's Amended Complaint; and Plaintiff's Counter-Motion for Summary Judgment" ("Response" and "Cross-Motion for Summary Judgment")[3] [ECF No. 40], filed July 27, 2018 by Texas Workforce Commission ("Plaintiff"); and "Defendant's Reply to Plaintiff's Response to Defendant's Partial Motion to Dismiss, Partial Motion for Summary Judgment, and Partial Motion to Remand Plaintiff's Amended Complaint; and Response to Plaintiff's [sic] Counter-Motion for Summary Judgment" ("Reply") [ECF No. 43], filed August 10, 2018 by Defendant.
After due consideration of the Motion to Dismiss, Motion for Summary Judgment, Motion to Remand, Response, Cross-Motion for Summary Judgment, Reply, and applicable law, the Motion for Summary Judgment is DENIED and the Cross-Motion for Summary Judgment is GRANTED. The Motion to Dismiss and Motion to Remand are DENIED AS MOOT.
I. BACKGROUND
A. The Randolph-Sheppard Act
In order to understand the underlying events and the issue in dispute, it is necessary to examine the structure and background *725 of the Randolph-Sheppard Act ("RSA"),[4] 20 U.S.C. § 107 et seq. The RSA grants priority to blind persons in the bidding process for contracts involving the operation of vending facilities on federal property.[5] Congress established the RSA "[f]or the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting ...."[6]
The RSA was enacted in 1936 and amended in 1954 and 1974.[7] The 1974 amendment changed "vending stand" to "vending facility" and included "cafeterias" as "vending facilities.[8] It is well established that cafeterias located on military bases are "cafeterias" for purposes of the RSA.[9] Accordingly, a blind vendor receives priority in the bidding process for cafeteria contracts on military bases under the RSA.[10]
The Secretary of the United States Department of Education[11] ("ED") administers the RSA and prescribes regulations for its implementation.[12] The Rehabilitation Services Administration within the ED oversees the operation of the program.[13] Federal agencies do not directly contract with the blind vendors, but instead contract with the designated state agency, known as a "State Licensing Agency" ("SLA").[14] The blind vendor is a licensee of the SLA[15] and earns the profits derived from the operation of a vending facility.
The SLA is invited to bid on such contracts.[16] The ED determines, after consultation with the managing agency, whether the blind vendor can provide "at a reasonable cost ... food of a high quality comparable to that currently provided employees ...."[17] If the SLA's proposal is "within the competitive range and has been ranked among those proposals which have a reasonable chance of being selected for final award," the licensed blind vendor's bid will be awarded priority.[18]
B. Factual Background
This matter involves Solicitation No. W911SG-14-R-0005, a contract for supporting dining services in several cafeterias at Fort Bliss.[19] Fort Bliss operates a "comprehensive program developed to ensure Soldiers are provided with safe and secure *726 food service and drinking water."[20] Army Regulations categorize contracts into two types of military dining facility contracts: Full Food Services ("FFS") and Dining Facility Attendant ("DFA") services.[21] A DFA services contract includes "[t]hose activities required to perform janitorial and custodial duties within dining facilities."[22] These tasks include "sweeping, mopping, scrubbing, trash removal, dishwashing, waxing, stripping, buffing, window washing, pot and pan cleaning, and other sanitation-related functions."[23] In contrast, Army Regulations define FFS contracts as "[c]ontracts that cover those activities that comprise the full operation of an Army dining facility."[24] They include, but are not limited to, requisitioning, receiving, storing, preparing, and serving of food.[25] FFS contracts may also include "the performance of related administrative, custodial, and sanitation functions."[26]
Plaintiff Texas Workforce Commission is the SLA for the state of Texas.[27] Harvey Johnson, the designated licensed blind vendor, provided cafeteria services at six dining halls on Fort Bliss from April 2003 to September 2014.[28] Two of the dining halls required FFS services, while the other four required DFA services.[29] Rather than continue the services under one contract following its expiration, the Army issued two separate contracts.[30] The Army issued Solicitation No. W911SG-14-R-0003 for FFS services.[31] Solicitation No. W911SG-14-R-0005 ("Solicitation")[32] exclusively involves DFA services and was set-aside for a small business.[33] As Plaintiff does not qualify as a small business, it was ineligible to bid on the Solicitation.[34] In brief, Plaintiff received priority for the FFS contract, but did not qualify for the DFA Services contract.
C. Defendant's Previously Filed Motion to Dismiss, Motion for Summary Judgment, and Motion to Remand
Prior to this Motion for Summary Judgment, Defendant filed a combined motion to dismiss, motion for summary judgment, and motion to remand.[35] Therein, Defendant moved to dismiss Plaintiff's suit on *727 the grounds that the RSA does not apply to DFA services contracts as a matter of law.[36] Critically, this motion focused on the military's categorization of DFA services contracts as a whole-not this specific Solicitation.[37]
Defendant contended the RSA's scope does not apply to contracts for DFA services, arguing the words "operate" and "operation" reflect an intention by Congress to give blind vendors priority only when they "operated" an entire cafeteria "in a manner that they are able to provide food service at comparable cost and comparable high quality."[38] In addition, Defendant asserted congressional directives signify that the RSA does not apply to a contract for discrete services where food preparation is not involved.[39]
In opposition, Plaintiff argued blind vendors receive a priority to operate all cafeteria contracts and contracts related to the operation of cafeterias on federal property pursuant to the RSA.[40] Plaintiff disputed the Army's narrow reading of the RSA, reasoning that its interpretation is not supported by the plain meaning of the statute or congressional intent.[41]
On March 28, 2018, the court declined to dismiss the cause under Federal Rule of Civil Procedure 12(b)(6) (" Rule 12(b)(6)") in its "Order Denying Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment and Motion to Remand with Leave to Re-file Motion for Summary Judgment and Motion to Remand" ("Order").[42] The court noted that "[t]he statute is silent on the applicability of the act to DFA Services."[43]
The court then analyzed the use of the words "operate" and "operation" within the statute on the basis that the plain meaning of those words would define the reach of the RSA.[44] The court was not persuaded that the plain meaning of the word "operate" resolved the issue after consulting The Merriam-Webster Dictionary and The Oxford English Dictionary.[45] The court noted that "[o]n one hand, the word "operate" could be read to include all necessary tasks to the functioning of a cafeteria," but "[o]n the other hand, 'operate' could signify only those who exert a level of authority over the cafeteria."[46] The court consequently declared the statutory language ambiguous.[47]
The court then examined congressional directives to evaluate whether Congress intended to narrow the scope of the RSA to exclusively FFS contracts, thereby excluding DFA services contracts or other mess attendant service contracts.[48] The *728 court rejected Defendant's position that several memoranda and directives by Congress and the Department of Defense show intent by Congress to narrow the reach of the RSA to exclusively FFS contracts.[49]
This court denied Defendant's motion for dismissal under Rule 12(b)(6), holding, "After a careful review of the RSA's plain language and relevant congressional history, the court declines to hold that the RSA does not apply to DFA Services contracts as a matter of law."[50] The court concluded that "a case-by-case approach is more appropriate."[51] Lastly, the court denied with leave to re-file Defendant's motion for summary judgment and motion to remand, as the parties had not adequately addressed them.[52]
D. The Amended Complaint
On April 6, 2018, Plaintiff moved for leave to file an amended complaint[53] on the grounds that the ED had recently issued a letter ("Opinion Letter")[54] addressing the applicability of the RSA to a contract for DFA services in military cafeterias.[55] The court granted Plaintiff's request and docketed the "First Amended Complaint" ("Amended Complaint").[56] The Opinion Letter was issued by Betsy DeVos, the Secretary of Education, and addressed to Pete Sessions, the representative for Texas's 32nd Congressional District in the United States House of Representatives.[57]
II. PARTIES' ARGUMENTS
A. Defendant's Arguments in Support of its Partial Motion to Dismiss, or in the Alternative, Partial Motion for Summary Judgment, and Partial Motion to Remand Plaintiff's Amended Complaint
Defendant moves yet again to dismiss this case for failure to state a claim, arguing the RSA does not apply as a matter of law to DFA Services contracts "of the kind at issue or specifically to the DFA services contract at issue."[58] According to Defendant, a letter to a congressional member is not a "definitive interpretation of a statute entitled to deference from a reviewing court."[59] Defendant contends that even if the Opinion Letter was entitled to Chevron deference, the RSA would not necessarily apply to all DFA services contracts.[60] Defendant proposes "that the terms 'operate' and 'operation' have a more limited meaning when applied in the full context in which those terms are used in the RSA."[61] Therefore, the RSA would not apply in this particular case, as the Solicitation "merely provides for supporting services."[62]
*729 Alternatively, Defendant moves for summary judgment on the basis that the arbitration panel's decision is supported by substantial evidence and is neither arbitrary, capricious, an abuse of discretion, or otherwise contrary to law.[63] Defendant points out that the Panel conducted a lengthy hearing and made "over 27 specific findings of fact that covered eight pages."[64] Thus, according to Defendant, summary judgment is appropriate.[65]
Defendant also asserts that the remaining issue-"whether the Army's action imposed a 'limitation on the placement or operation of a vending facility' "-should be remanded to the Panel for consideration.[66]
B. Plaintiff's Arguments in Support of its Response and its Counter-Motion for Summary Judgment
Plaintiff opposes dismissal under Rule 12(b)(6) on the basis that it has asserted a claim "concerning the reach of the RSA to the Fort Bliss solicitation."[67] Plaintiff contends the Opinion Letter is entitled to deference and is thus controlling.[68] In accordance with the Opinion Letter, Plaintiff claims, the RSA applies to contracts for DFA services of the "kind at issue."[69] Plaintiff contends that even if the Opinion Letter was not controlling, the letter would still serve as persuasive authority on the matter.[70]
Plaintiff argues summary judgment is also not appropriate on the basis that the Panel's decision "is not in accordance with the law."[71] Plaintiff asserts that the Panel's conclusions are not entitled to deference and must be set aside if not in accordance with the law.[72] Plaintiff reiterates that the Opinion Letter interprets the RSA as applying to "full" DFA services contracts, such as the one in this case.[73]
Plaintiff also moved for summary judgment, arguing the RSA applies to this particular DFA services contract as a matter of law.[74] Based on this court's previous Order and the Opinion Letter, Plaintiff claims the DFA contracts should be evaluated on a case-by-case basis.[75] Consequently, the RSA would apply to this particular Solicitation as a matter of law.[76]
III. APPLICABLE LAW
A. Standard for Summary Judgment
This court previously denied the initial motion to dismiss, declining "to hold that the RSA does not apply to DFA Services contracts as a matter of law."[77] Rather, this court concluded "a case-by-case approach is more appropriate."[78] Defendant's prior motion to dismiss "focuse[d] on the military's categorization of DFA Services contracts, not whether the RSA applies to this contract in particular."[79]
*730 Defendant incorporates these previous arguments into its current combined filing, but now argues the RSA does not apply to this specific DFA services contract.[80] Plaintiff's opposes dismissal under Federal Rule of Civil Procedure 12(b)(6), as it has asserted a claim "concerning the reach of the RSA" to this Solicitation.[81]
The motions before the court hinge on a specific question of law: whether the RSA applies to this specific Solicitation for dining facility attendant services at a military cafeteria located on Fort Bliss.[82] Instead of first considering the Motion to Dismiss under the Rule 12(b)(6) standard, it is in the interest of judicial efficiency to resolve this matter by applying the summary judgment standard to the entirety of this dispute. The parties do not oppose the application of the summary judgment standard.[83]
Summary judgment is only proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[84] A genuine issue of material fact exists where "there is evidence sufficient for a rational trier of fact to find for the non-moving party."[85] The substantive law defines whether disputed facts are material.[86] The party moving for summary judgment bears an initial burden of identifying those portions of the pleadings and any discovery on record, including any affidavits, which it believes demonstrate the absence of a genuine issue of material fact.[87] In considering only admissible evidence in the pretrial record,[88] the court will "view all facts in the light most favorable to the non-moving party,"[89] and draw all factual inferences in the nonmovant's favor.[90] If the moving party cannot demonstrate the absence of a genuine issue of material fact, summary judgment is inappropriate.[91]
If the movant does meet this burden, the nonmovant subsequently must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial."[92] Accordingly, the "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, *731 or by only a scintilla of evidence."[93] "[T]he nonmovant may not rely on mere allegations in the pleadings; rather, the nonmovant must respond to the motion for summary judgment by setting forth particular facts indicating that there is a genuine issue for trial."[94] The court does not, "in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts."[95] If the nonmovant fails to satisfy this requirement, then summary judgment is appropriate.[96] Summary judgment is appropriate "if no reasonable juror could find for the nonmovant."[97]
Materiality is defined by the substantive law underlying an issue.[98] "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[99] Disputes over facts that are irrelevant or unnecessary will not suffice to preclude summary judgment.[100]
B. Review Under the Randolph-Sheppard Act
Under the RSA, a decision by an arbitration panel is subject to review as a "final agency action" under the standards set forth in the Administrative Procedure Act, 5 U.S.C. § 706(2).[101] "A person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."[102] "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of an agency action."[103] A reviewing court shall set aside an agency action if the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law."[104] Legal conclusions are subject to de novo review.[105]
IV. DISCUSSION
A. Defendant's Motion for Summary Judgment
1. The Panel's Decision
To address whether the Army violated the RSA during the bidding process, Plaintiff requested an arbitration hearing in accordance with 20 U.S.C. § 107d-2.[106] The *732 panel of three arbitrators ("Panel") conducted a hearing on July 19, 2016.[107] The Panel, with one member dissenting, ultimately concluded the RSA did not apply to the Solicitation, and the Army therefore did not violate the RSA during the bidding process.[108]
The Panel identified the underlying legal issue as one of "statutory interpretation which is a matter of law."[109] The Panel then stated it "shall make a determination de novo as to whether the contracting officer's conclusion that the RSA did not apply to a DFA services contract is entitled to deference by this panel."[110] While the court agrees that this case involves an issue of statutory interpretation, the Panel does not explain why the Army's decision is entitled to deference. Indeed, the parties have not put forth any legal theory that the Army is afforded deference in cafeteria contracting. Such an interpretation is at odds with the RSA.
In its analysis, the Panel first discussed prior arbitration decisions and two decisions from the Federal Court of Claims.[111] In order to address the scope of the RSA, the Panel then looked to the tension between the RSA and the Javits-Wagner-O'Day Act ("JWOD"), 41 U.S.C. § 8501 et seq. ,[112] "to help draw the line as to what work each statute was intended to cover."[113] After an analysis of the National Defense Authorization Act for Fiscal Year 2004,[114] the John Warner National Defense Authorization Act for Fiscal Year 2007 ("JWA"),[115] and subsequent reports, the Panel reasoned that the JWA "does not expand the coverage of the RSA to include mess attendant services, or services supporting the operation of all or any part of a military dining facility."[116]
The Panel appears to pull its idea of deference from a report, where the DOD stated that "[t]he Secretaries of the Military Departments should have discretion *733 to define requirements and make procurement decisions concerning contracting for military dining support and the operation of a military dining facility."[117] Such reliance on this report is misguided, as it promotes policy; the report is neither reflective of nor can it supplant congressional intent.
Despite references to underlying facts of this Solicitation, the Panel's decision is not based on an evaluation of these facts. In addition to its theory of deference, the Panel's decision is largely based on the conclusion that the RSA does not apply as a matter of law. This is "contrary to law,"[118] and the court sets aside the Panel's decision for the reasons below.
2. Whether the Opinion Letter is Entitled to Deference
As fate would have it, the ED issued a long-awaited interpretation-the Opinion Letter-in March 2018.[119] Therein, the ED addressed the applicability of the RSA to DFA services contracts in military cafeterias.[120] It provides, in relevant part:
The Education Department believes that the Randolph-Sheppard Act priority applies to both types of contracts. The term "operation" in the Act means that the vendor must "manage" or "direct the working of" the cafeteria. Oxford English Dictionary (2d ed. 1989). Nothing in the Randolph-Sheppard Act requires a vendor to participate in every activity of the cafeteria in order to "manage" or "direct the working of" the cafeteria. Where a vendor is responsible for all the functions of the cafeteria aside from those performed by military personnel-such as supervisory, administrative, and sanitation-related functions-the vendor can be said to "manage" the cafeteria even if the vendor is not preparing the food. Indeed the cafeteria would not be able to operate without the vendor performing these functions.
Some contracts may be limited to discrete tasks so as not to entail overall "operation" of the cafeteria, but that characterization would not apply to all "dining facility attendant" contracts.
Despite the ED's interpretation of the RSA, Defendant claims that a letter to a member of Congress "is not the kind of action that establishes a definitive interpretation of a statute entitled to deference from a reviewing court."[121] Defendant argues this letter is not entitled to Chevron deference.[122] In stark contrast, Plaintiff contends the letter should be given deference, but is less specific as to what sort of deference the letter is due.[123] Plaintiff argues that "[e]ven if the Opinion were not controlling, the court may still consider the *734 Opinion according to its persuasive power."[124] In other words, Plaintiff asserts that even if the letter is not entitled to Chevron deference, the letter would still be entitled to Skidmore deference.[125] This court must determine what level of deference, if any, the Opinion Letter is afforded.
It is well established that "considerable weight should be accorded to an executive department's construction of a statutory scheme it is entrusted to administer ...."[126] This is not absolute. "The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances, and courts have looked to the degree of the agency's care, its consistency, formality, and relative expertness, and to the persuasiveness of the agency's position."[127] Under the Chevron framework, "[i]f Congress 'has directly spoken to the precise question at issue,' we 'must give effect to [its] unambiguously expressed intent'; on the other hand, 'if the statute is silent or ambiguous,' we must defer to the agency's interpretation so long as it is 'based on a permissible construction of the statute.' "[128]
a. Whether the Statute Is Ambiguous
The first question is whether Congress has directly spoken as to the RSA's applicability to contracts for discrete cafeteria services. The RSA provides:
For the purposes of providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting, blind persons licensed under the provisions of this chapter shall be authorized to operate vending facilities on any Federal property.[129]
This plainly lists the RSA's purpose as providing blind persons with lucrative employment, increasing economic opportunity, and fostering self-sustainability. It then authorizes a blind individual "to operate vending facilities on any Federal property."[130] The statute does not facially distinguish between categories of cafeteria contracts, specifically the military's categorization of cafeteria contracts as either for FFS or DFA Services. Nor does the statute does not make any distinctions on the application of the RSA to mess attendant services or other contracts for discrete services. In a similar fashion, the corresponding federal regulations[131] do not appear to restrict the applicability of the act to only FFS contracts.[132]
While a plain reading of the statute does not appear to limit the application of the RSA, the use of the word "operate" in 20 U.S.C. § 107(a) is hotly contested. The heavily disputed language originates in this context: "blind persons licensed under the provisions of this chapter shall be authorized *735 to operate vending facilities on any Federal property."[133] The central issue is whether a contract for DFA services requires the contractor to "operate" a vending facility. If so, the contract is subject to the RSA, and the blind vendor receives priority in the bidding process. This is not a question unique to this motion.[134] Sister courts faced with this same dispute have struggled with the meaning of "operate" and "operation" in the context of the RSA.[135]
This court has already engaged in an extensive analysis in its prior Order regarding the meaning of "operate."[136] To address this question of statutory interpretation, the court examined the plain language of the RSA.[137] The court noted that the RSA's definitional section does not define "operate."[138] After a review of the definition of "operate" in The Merriam-Webster Dictionary[139] and The Oxford English Dictionary ,[140] this court reasoned:
the court is not persuaded that the plain meaning of the word "operate" resolves the issue of the RSA's applicability to DFA Services contracts. On one hand, the word "operate" could be read to include all necessary tasks to the functioning of a cafeteria. On the other hand, "operate" could signify only those who exert a level of authority over the cafeteria. Neither the language of the RSA, nor the definitions found in The Merriam-Webster Dictionary or The Oxford English Dictionary clarify what level of executory function is necessary to "operate" a cafeteria. The definitions appear to be inconsistent, and both interpretations of the parties appear reasonable.[141]
This court then looked to whether congressional directives showed a clear intention by Congress to narrow the scope of the RSA, thereby excluding DFA services contracts from its reach.[142] After a review of the documents and sources cited by Defendant, this court declined to interpret the RSA in such a narrow fashion without a substantial showing of congressional intent.[143]
Despite this Order, Defendant again argues that the RSA cannot be construed as applying to DFA services contracts.[144] Defendant offers three arguments in support of such a contention: (1) the terms "operate" and "operation" have "a more limited meaning when applied in the full context" of the RSA[145] ; (2) the court misconstrued the John Warner Act in the prior Order[146] ; and (3) Congress's failure to implement policies set forth in a report issued in 2006 ("2006 Joint Report")[147] is not a rejection *736 of such policies.[148]
The court rejects Defendant's first argument. Defendant cites to the use of the terms "operate" and "operation" throughout the RSA and its accompanying regulations, insisting "the terms are used in a way that makes sense only if the blind vendor would be operating the entire vending facility ...."[149] The court already considered the use of the terms "operate" and "operation" in the prior Order and reiterates concern about the level of control necessary to qualify as a vendor who "operates" a cafeteria.[150] It is possible that multiple vendors could collaborate to fulfill the cafeteria's purpose of providing food. The court declines to adopt a narrow understanding of those terms when ambiguity remains.
In addition, Defendant opposes this court's analysis in the prior Order, where the court reasoned that "[b]y prohibiting the poaching of already-existing JWOD contracts, the provision suggests that the RSA could apply to a contract for ancillary reasons."[151] Defendant also takes issue with the court's analysis that Congress's failure to implement policies as set forth in the 2006 Joint Report "suggests a reject of these policy recommendations."[152] Defendant argues that Congress did not take legislative action for two reasons: (1) it was not asked to do so with these particular policy recommendations; and (2) it was unnecessary to enact legislation, as the RSA's inapplicability to DFA services contracts was already reflected in the law.[153]
The court need not address these arguments. First, as this court and Defendant has already pointed out, statements drafted following the enactment of legislation are of limited value in determining the meaning of a provision.[154] Another glaring issue is that the JWA and the 2006 Joint Report do not reflect clear , if any, congressional intent. The court will not restrict the applicability of the RSA in the absence of clear congressional intent. The court sees no persuasive reason to stray from its previous analysis. The statutory language is ambiguous and fails to resolve the issue at hand. Accordingly, Congress has not "directly spoken to the precise question at issue."[155]
b. Whether the Opinion Letter Is Entitled to Deference
Under Chevron , the court "defers to the agency's interpretation so long *737 as it is 'based on a permissible construction of the statute.' "[156] This case involves an interpretation contained in a letter from the Secretary of Education.[157] It is not a regulation or an interpretation issued after a formal procedure, such as notice-and-comment rulemaking. "Interpretations such as those in an opinion letter-like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law-do not warrant Chevron -style deference."[158] Consequently, the Opinion Letter is not entitled to Chevron deference.
While Chevron deference is not appropriate, opinion letters may nevertheless be "entitled to respect" to the extent they are persuasive.[159] This "respect" is known as Skidmore deference.[160] The level of deference accorded under Skidmore depends on "the persuasive force of the agency interpretation."[161] "[R]ulings, interpretations and opinions ..., while not controlling upon the courts by reason of their authority, do constitute a body of experience and informed judgement to which courts and litigants may property resort for guidance."[162] The power of its persuasion is determined by "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade ...."[163]
Although the Opinion Letter does not carry the "force of law" under Chevron , the Opinion Letter is entitled to a level of Skidmore deference based on the thoroughness and the validity of its reasoning, as well as its consistency with other pronouncements.[164] After careful review, the court finds that the Opinion Letter contains thorough reasoning. It first acknowledges there has been "some dispute over the types of contracts to which the priority applies," specifically dining facility attendant contracts.[165] Referring to the plain meaning of "operation" as defined in the The Oxford English Dictionary , the Opinion Letter notes the act requires the vendor to "manage" or "direct the working of" the cafeteria.[166] It reasons a vendor "can be said to 'manage' the cafeteria, even if the vendor is not preparing the food."[167] This is because a "cafeteria would not be able to operate without the vendor performing those functions."[168] Lastly, the Opinion Letter leaves open the possibility that some contracts would be so limited as to not qualify as "operating" for purposes of the RSA.[169] This suggests that some DFA contracts would fall outside of the RSA's reach. The RSA's application to a *738 dining facility attendant services contract would depend on the tasks and nature of the contract itself, not simply the categorization of the contract.
Not only does the letter contain thorough reasoning, it cites to a recent arbitration decision, State of Kansas, Department of Children & Family Services v. United States Department of the Army, Fort Riley ("Fort Riley "),[170] as an example of a qualifying DFA services contract.[171] There, the arbitration panel held in favor of the blind vendor and concluded:
Where the tasks to be performed by a contract for DFA services includes tasks that constitute an integral element of providing food service at a military cafeteria facility, or pertain to the operation of a cafeteria, or tasks that without which the cafeterias would not be able to function, fall within the definition included in the RS Act, and its implement regulations, and are entitled to RS Act priority when awarding said contract.[172]
Simply put, Fort Riley stands for the proposition that if a DFA services contract includes tasks instrumental to providing cafeteria services, these contracts are subject to RSA priority. The ED's consideration of the matter and reference to a previous arbitration decision is thorough. Fort Riley gives additional clarity, as it provides a real-world application of the RSA to a contract for DFA services. In addition to its persuasive nature, the Opinion Letter promotes consistency in future arbitration and court decisions. The ED's reasoning is persuasive.
Defendant argues that the Opinion Letter "offers no detailed analysis" to support Plaintiff's assertion that the RSA applies to all DFA services contracts.[173] Defendant adds that Plaintiff's position-that the RSA applies to this specific contract on the grounds that the DFA vendor performs all other services than those performed by military personnel-is an "overly broad and illogical interpretation of this correspondence and of the RSA."[174] Defendant is mistaken.
First, Plaintiff does not propose that all DFA services contracts are subject to the RSA.[175] Rather, it argues this particular DFA services contract is subject to the RSA according to the Opinion Letter.[176] Second, Defendant ignores the fact that the ED administers the RSA.[177] The ED has provided a well-reasoned interpretation and an example of a qualifying DFA services contract.[178] The court sees no reason to conclude that such an interpretation is overly broad, particularly in light of the RSA's goal to "enlarge[ ] the economic opportunities of the blind."[179]
Furthermore, the Opinion Letter is entirely consistent with this court's prior Order. For instance, the ED and this court agree that "operate" means that a vendor must "manage" or "direct the working" of the cafeteria.[180] This court also concluded *739 that a "case-by-case approach" was appropriate.[181] This is congruent to the ED's conclusion that "[s]ome contracts may be limited to discrete tasks so as to not entail overall "operation" of the cafeteria, but that characterization would not apply to all 'dining facility attendant' contracts."[182] Both this court and the ED agree that whether the RSA applies to a certain contract for DFA services depends on the nature and tasks of the contract itself.
The Opinion Letter is entitled to Skidmore deference. Unfortunately, such a conclusion does not resolve the entirety of this matter. The court must next consider whether this Solicitation falls within the reach of the RSA.
3. Whether the RSA Applies to the Specific Solicitation at Issue
In Fort Riley , the RSA applied where the DFA services contract consisted of "tasks that constitute an integral element of providing food service at a military cafeteria facility, or pertain to the operation of a cafeteria or tasks that without which the cafeterias would not be able to function."[183] The Fort Riley panel concluded that the tasks in the Performance Work Statement ("PWS") "constitute an integral element of providing service, pertain to the operation of the cafeteria, and without which the cafeterias at Fort Riley would not be able to function."[184] The following tasks were illustrative:
Performance Work Statement (PWS), at 3.1.2, requires that the contractor execute and maintain a quality control plan in support of dining facility operations . Also, at 3.2.1., the PWS required that the contractor shall clean and sanitize food service equipment and surfaces to support dining facility operations . Additional requirements also appear: prepare, maintain and clean dining areas to afford each diner a clean area to eat without delay and keep appropriate condiments available without delay ; spills are to be cleaned, soiled dinnerware occasionally left by diners are to be removed, and soiled trays are to be bussed within five minutes of occurrence ; tray carts are to be bussed and replaced during meal serving period and space made available for soiled trays, without diner delay 100% of the time .[185]
The relation of the tasks to the dining facility operations is key.
The Solicitation in the instant case appears identical to the Fort Riley contract. The PWS specifies that "[t]his contract includes all functions, tasks, and responsibilities normally performed by a Food Service Operation."[186] It includes tasks necessary to the operation of a cafeteria: providing and cleaning dinnerware, utensils and trays "without delay 100%" during the meal period[187] ; cleaning food and beverage spills during meals "within 5 minutes of occurrence"[188] ; emptying garbage cans[189] ; and bussing trays "within 5 *740 minutes of occurrence."[190] While the PWS includes other tasks, such as cleaning curtains and draperies, the PWS clearly includes tasks that are "an integral element of providing food service at a military cafeteria facility, or pertain to the operation of a cafeteria, or tasks that without which the cafeterias would not be able to function."[191] A cafeteria cannot function if diners are not given silverware, spills are not mopped up, and leftover food is not wiped away. The Solicitation falls within the reach of the RSA, as it involves instrumental cafeteria tasks.
Defendant argues the RSA still does not apply to this particular Solicitation, strongly opposing Plaintiff's characterization of the Solicitation as "full and robust."[192] Plaintiff's word choice is inapposite. The question is whether this Solicitation contains tasks that are integral to the cafeteria's functioning. Even the Panel suggests that this DFA services contract includes services integral to the operation of the cafeteria.[193] Russell D. Campbell, Army Sustainment Command Food Program Manager, testified "that services in a DFA contract cover a portion of the operation of a cafeteria and that DFA services are an inherent part of the operation of a cafeteria."[194] The Panel also found the PWS includes "all functions, tasks and responsibilities normally performed by a Food Service Operation."[195]
Defendant nevertheless maintains that the RSA does not apply in this case, as the "services performed by the contractor do not include the preparation or service of food."[196] This is mistaken. The ED explicitly rejected this argument, stating that "the vendor can be said to 'manage' the cafeteria, even if the vendor is not preparing the food."[197] Defendant also argues the Solicitation does not fall within the RSA's reach, as the PWS's tasks are "generally" duties related to "facility maintenance and sanitation, in essence busboy and other cleanup services."[198] "Generally" is not the standard. The question is whether the Solicitation includes "tasks that constitute an integral element of providing food service at a military cafeteria facility, or pertain to the operation of a cafeteria or tasks that without which the cafeterias would not be able to function."[199] Supporting cafeteria services-such as "busboy services"-are integral to the functioning of a cafeteria.
Defendant points to Mississippi Department of Rehabilitative Services v. United States[200] to support the proposition that courts have not "traditionally ... applied the RSA to these types of contracts."[201] Such a statement is a shallow understanding of the court's reasoning in Mississippi Department of Rehabilitative Services. In that case, the court looked at prior decisions, where arbitration panels had applied the case-by-case approach.[202] The courts *741 upheld the arbitration decisions under the "arbitrary and capricious" standard.[203] An important distinction between those decisions and the Panel's decision is that the panels had considered the specific contracts at issue and looked at the facts.[204] This is in stark contrast to the Panel's decision here, as it is based on a legal conclusion that the RSA does not apply to all DFA services contracts. The court in Mississippi Department of Rehabilitative Services noted, after reviewing other decisions, that it "may" conclude that the RSA does not apply to "busboy and other cleanup services."[205] However, it also acknowledged that the meaning of "operation" was still an open question.[206]
In sum, the Secretary of Education has issued a letter entitled to Skidmore deference, resolving the exact dispute at hand. The Opinion Letter is well-reasoned and offers an answer to years of uncertainty. As the Solicitation in this case includes tasks that are integral and necessary to the operation of cafeterias, the Solicitation is subject to RSA priority. Notably, such an understanding furthers the RSA's goal of "providing blind persons with remunerative employment, enlarging the economic opportunities of the blind, and stimulating the blind to greater efforts in striving to make themselves self-supporting ...."[207] The Motion for Summary Judgment is thus DENIED .
As the court considered the filing under the summary judgment standard, Defendant's motion to dismiss under Rule 12(b)(6) is DENIED AS MOOT .
Defendant also moves to remand any remaining issues to the Panel, specifically whether the Army improperly imposed a limitation on the operation of a cafeteria without first seeking approval by the ED.[208] Plaintiff asserts the issue should only be remanded to the Panel if the court finds that the RSA does not apply to the Solicitation.[209] As this court has found the RSA applies, no issues remain for the Panel's consideration. The Motion to Remand is therefore DENIED AS MOOT .
B. Plaintiff's Cross-Motion for Summary Judgment
Plaintiff moves for summary judgment on the grounds that the RSA applies to this Solicitation as a matter of law.[210] Plaintiff asserts that due to the Opinion Letter and this court's Order, this DFA services contract is a "full and robust" contract and thus qualifies for RSA priority.[211] Defendant opposes summary judgment, arguing that Plaintiff "incorrectly construes the correspondence from ED as a statutory interpretation of the RSA; and further incorrectly interprets the correspondence as support of TWC's assertion that the RSA applies to the DFA contract at Fort Bliss."[212] In other words, Defendant's reasoning is identical to its arguments above.
Summary judgment in favor of Plaintiff is appropriate, as this court has already *742 found: (1) the Opinion Letter is entitled to Skidmore deference; and (2) this particular Solicitation is subject to the RSA. The Cross-Motion for Summary Judgment is hereby GRANTED .
IV. CONCLUSION AND ORDERS
The court enters the following orders:
1. The arbitration panel's decision is SET ASIDE .
2. "Defendant's Partial Motion to Dismiss, or in the Alternative, Partial Motion for Summary Judgment and Partial Motion to Remand" [ECF No. 39] is DENIED .
3. "Plaintiff's Response to Defendant's Partial Motion to Dismiss, Partial Motion for Summary Judgment, and Partial Motion to Remand Plaintiff's Amended Complaint; and Plaintiff's Counter-Motion for Summary Judgment" [ECF No. 40] is GRANTED . The court GRANTS summary judgment in favor of Plaintiff.
SO ORDERED.

Defendant moves for dismissal, summary judgment, and remand in a single filing. The court is considering the entirety of this filing as a motion for summary judgment under Federal Rule of Civil Procedure 56. See "Order to Show Cause," ECF No. 44, filed Oct. 5, 2018; "Plaintiff's Response to Court's Order to Show Cause," ECF No. 45, filed Oct. 10, 2018; "Defendant's Response to the Court's Order to Show Cause," ECF No. 46, filed Oct. 18, 2018.

Upon judicial review, the Department of Education is substituted as the defendant for the Department of the Army. 5 U.S.C. § 703 ("If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.").

Plaintiff submitted its response and cross-motion for summary judgment in a single filing.

Outside sources or parties sometimes refer to the Randolph-Shepherd Act as "R-S Act" or "RS Act." The court will refer to the Randolph-Sheppard Act as "RSA."

See 20 U.S.C. § 107.

Id. § 107(a).

Miss. Dep't of Rehab. Servs. v. United States , 61 Fed.Cl. 20, 22 (2004).

See NISH v. Cohen , 247 F.3d 197, 199 (4th Cir. 2001)

See ids="11106522" index="9" url="https://cite.case.law/f3d/247/197/#p199">id. at 203-04.

NISH v. Cohen , 95 F.Supp.2d 497, 501 (E.D. Va.2000).

For purposes of this order, "Secretary of Education" is synonymous with "Department of Education."

See 20 U.S.C. § 107a ; 34 C.F.R. §§ 395.1 -395.38.

20 U.S.C. § 107a(a)(1).

34 C.F.R. § 395.33(b).

20 U.S.C. § 107a(b).

34 C.F.R. § 395.33(b).

Id. § 395.33(a).

Id. § 395.33 (a),(b).

See generally In the Matter of the Arbitration: Tex. Dep't of Assistive and Rehab. Servs. v. U.S. Dep't of the Army, Fort Bliss , Cause No. R-S/13-13, at 5 ¶ 12 (Nov. 2, 2016) (hereinafter "Panel Dec."), ECF No. 1-1, filed Jan. 31, 2017.

Id. at 4 ¶ 7.

Id. at 4 ¶ 8. Army Regulation 30-22 governs food services for the Army.

"Army Food Program" ("Army Reg."), Army Reg. 30-22, at 57 (July 24, 2012), ECF No. 17-1.

Id. at 57-58.

Id. at 58.

Id.

Id.

Panel Dec. 3 ¶ 5. Texas Workforce Commission was formerly known as Texas Department of Assistive and Rehabilitative Services ("DARS") and is referred to as "DARS" in the record and the Panel's decision.

W. at 5 ¶ 11.

Id.

Id. at 5 ¶ 12.

Id.

While the court will refer to this particular DFA services contract as "Solicitation," "solicitation" is synonymous with "contract" for purposes of this order.

Panel Dec. 5 ¶ 12.

Id.

Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment and Motion to Remand" ("Prior Mot. to Dismiss"), ECF No. 17, Aug. 24, 2017. This combined filing is different than the one before the court today, but both filings ultimately address the same issue.

Id. at 8.

"Order Denying Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary judgment and Motion to Remand with Leave to Re-File Motion for Summary Judgment and Motion to Remand" ("Ord.") 13, ECF No. 31, filed Mar. 28, 2018 (citing Prior Mot. to Dismiss 11).

Prior Mot. to Dismiss 13.

See id. at 14-16.

"Plaintiff's Response to Defendant's Motion to Dismiss, or in the Alternative, Motion for Summary Judgment and Motion to Remand" 11 ¶ 29, ECF No. 26, filed Oct. 10, 2017 (emphasis added).

Id. at 16-18 ¶¶ 41-44.

Ord. 33.

Id. at 15.

Id. at 20.

Id. (citing Operate , The Merriam-Webster Dictionary (updated Mar. 3, 2018); Operate , The Oxford English Dictionary (3d ed. 2004) ).

Id. at 20.

Id. at 22.

Ord. 22.

Id. at 33.

Id.

Id.

Id. at 34.

"Motion for Leave to File First Amended Complaint" ("Mot. for Leave"), ECF No. 32, filed Apr. 6, 2018.

"First Amended Complaint," ECF No. 35, filed Apr. 23, 2018, Letter from Betsy DeVos, Secretary of Education, United States Department of Education, to Pete Sessions, Representative, House of Representatives (Mar. 5, 2018) [hereinafter "Op. Letter"].

Mot. for Leave 1-2 ¶ 2.

ECF No. 35, filed Apr. 23, 2018.

See generally Op. Letter.

Mot. 4.

Id. at 5.

Id. at 6.

Id. at 7.

Id. at 12.

Id. at 13.

Mot. 15.

Id. at 16.

Id.

Resp. 5.

Id. at 10.

Id. at 7.

Id. at 11.

Id. at 5.

Id.

Resp. 11-12.

Id. at 12.

Id.

Id.

Ord. 33.

Id.

Id. at 13.

Mot. 4.

Resp. 5.

See Mot. 3; Resp. 12.

See "Order to Show Cause," ECF No. 44, filed Oct. 5, 2018; "Plaintiff's Response to Court's Order to Show Cause," ECF No. 45, filed Oct. 10, 2018 ("TWC does not oppose the Court's application of the summary judgment standard"); "Defendant's Response to the Court's Order to Show Cause," ECF No. 46, filed Oct. 18, 2018 ("The United States hereby submits its notice that it has no opposition to the Court's application of the Rule 56 standard to the cross motions.").

Fed. R. Civ. P. 56(a).

Perez v. Region 20 Educ. Serv. Ctr. , 307 F.3d 318, 323 (5th Cir. 2002) (citation omitted).

Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

See Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Fowler v. Smith , 68 F.3d 124, 126 (5th Cir. 1995) (citation omitted).

Blow v. City of San Antonio, Tex. , 236 F.3d 293, 296 (5th Cir. 2001) (citations omitted).

Cheatham v. Allstate Ins. Co. , 465 F.3d 578, 582 (5th Cir. 2006) (per curiam) (citation omitted).

Tubacex, Inc. v. M/V Risan , 45 F.3d 951, 954 (5th Cir. 1995).

Celotex , 477 U.S. at 324, 106 S.Ct. 2548 (internal quotation marks and citation omitted).

Little v. Liquid Air Corp. , 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam) (internal quotation marks and citations omitted).

Caboni v. Gen. Motors Corp. , 278 F.3d 448, 451 (5th Cir. 2002) (internal quotation marks and citations omitted).

Little , 37 F.3d at 1075 (emphasis removed).

Tubacex , 45 F.3d at 954.

Id.

Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

Id.

Id.

20 U.S.C. § 107d-2(a) ("Such panel shall, in accordance with the provisions of subchapter II of chapter 5 of Title 5, give notice, conduct a hearing, and render its decision which shall be subject to appeal and review as a final agency action for purposes of chapter 7 of such Title 5.").

5 U.S.C. § 702.

Id. § 706.

Id. § 706(2)(A).

Macktal v. U.S. Dep't. of Labor , 171 F.3d 323, 326 (5th Cir. 1999).

Letter from Barbara J. Madrigal, Assistant Commissioner, Division for Blind Services, Texas Department of Assistive and Rehabilitative Services, to Janet LaBreck, Commissioner, Rehabilitation Services Administration, United States Department of Education (July 21, 2014) (in the record); see also Letter from Barbara J. Madrigal, Assistant Commissioner, Division for Blind Services, Texas Department of Assistive and Rehabilitative Services, to Janet LaBreck, Commissioner, Rehabilitation Services Administration, United States Department of Education (July 16, 2014) (in the record).

Panel Dec. 1.

Id. at 10.

Id. at 12.

Id.

Id. at 12-13.

The JWOD established a Committee for Purchase from People Who are Blind or Severely Disabled ("CFP"), which maintains a procurement list. 41 U.S.C. §§ 8502, 8503. Products and services are placed on the list, and federal government entities must obtain those products and services from qualified organizations that employ the blind and severely disabled. Id. §§ 8501(6),(7), 8503, 8504. In other words, the RSA gives preference to blind vendors who manage a vending facility, and the JWOD gives preference to entities that employ individuals who are blind or severely disabled. "But the two acts and their implementing regulations do not define clearly the boundary that separates the reach of one act from the reach of the other, and disputes thus arise about which should apply to certain dining facility services on federal properties." Kansas v. United States , 171 F.Supp.3d 1145, 1149 (D. Kan. 2016). This dispute does not, however, present a conflicting relationship between the application of the JWOD and RSA; the Solicitation in this case is set aside for a small business under the Small Business Act, 15 U.S.C. § 637(a). The RSA priority is superior. See Automated Sys., Inc. v. United States , 49 Fed.Cl. 570, 577 (2001) (explaining that the RSA preference has priority over the Section 637(a) preference).

Panel Dec. 18

Pub. L. 108-136 tit. VIII, 117 Stat. 1556 (2003).

Pub. L. 109-364, tit. VIII, 120 Stat. 2347 (2006).

Panel Dec. 21.

Id. It is not clear as to what "Report" refers to. The Panel Decision first discusses a report filed on March 16, 2007 following a directive from the 2006 NDAA to file a report with recommendations. See id. at 19. The Panel also refers to a second report, but is less specific as to the context of that report. See id. at 19-20. It is possible that this "Report" refers to a joint statement of policy by the Secretary of Defense, Secretary of Education, and the Chairman of the CFP addressing the application of the RSA and JWOD. Section 848 of the 2006 NDAA directed the Secretary of Defense, Secretary of Education, and the Chairman of the CFP to issue a joint statement of policy.

5 U.S.C. § 706(2).

See generally itation index="93" url="https://cite.case.law/citations/?q=5%20U.S.C.%20%C2%A7%20706">id. The Panel "strongly urge[d]" the ED to promulgate regulations "that would definitively answer this question and avoid the multiple arbitrations and Court cases that have arisen as others have attempted to answer it." Panel Dec. 22.

See generally Op. Letter.

Mot. 5.

Id. (citing Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc. , 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ).

See Resp. 10.

Id.

Id. (citing Skidmore v. Swift & Co. , 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944) ).

United States v. Mead Corp. , 533 U.S. 218, 227-228, 121 S.Ct. 2164, 150 L.Ed.2d 292 (2001) (internal quotation marks and citation omitted).

Id. at 228, 121 S.Ct. 2164.

Tex. Clinical Labs, Inc. v. Sebelius , 612 F.3d 771, 775 (5th Cir. 2010) (citing Chevron USA v. Nat. Res Def. Council, Inc. , 467 U.S. 837, 842 -43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984) ).)

20 U.S.C. § 107(a).

Id.

34 C.F.R. § 395.33.

For a more thorough discussion, see Ord. 16-17.

20 U.S.C. § 107(a) ("emphasis added").

See generally Prior Mot.; see also Kansas v. United States , 171 F.Supp.3d 1145, 1159-60 (D. Kan. 2016) ; Wash. State Dep't of Servs. for the Blind v. United States , 58 Fed.Cl. 781, 789-92 (2003) ; Miss. Dep't of Rehab. Servs. v. United States , 61 Fed.Cl. 20, 26-28 (2004).

See Kansas , 171 F.Supp.3d at 1159-60 ; Wash. State Dep't of Servs. for the Blind , 58 Fed.Cl. at 789-92 ; Miss. Dep't of Rehab. Servs. , 61 Fed.Cl. at 26-28.

See Ord. 16-22.

Id. at 14-16.

Id. at 17.

Operate , The Merriam-Webster Dictionary (updated Mar. 3, 2018).

Operate , The Oxford English Dictionary (3d ed. 2004).

Ord. 20 (internal citations omitted).

See id. at 22-33.

Id. at 33.

See Mot. 7.

Id.

Id. at 9.

Following confusion regarding boundary of the RSA and the JWOD to military cafeteria contracts, Congress adopted § 848 of the 2006 NDAA. See National Defense Authorization Act , § 848(b), Pub. L. No. 109-163, tit. VII, 119 Stat. 3136 (2006). Therein, section 848(b) directed the Secretary of Defense, the Secretary of Education, and the Chairman of the CFP to issue a joint statement of policy addressing the application of the RSA and JWOD to "both the operation and management of all or any part of a military mess hall ...." Id. The court refers to this report as the "2006 Joint Report."

Id. at 10.

Id. at 8.

See Ord. 19 ("[I]t is not clear how much control is necessary to be deemed as "operating." The plain meaning of this clause does not necessarily suggest that to provide food of high quality that the blind vendor must be solely responsible in doing so. It is possible that multiple blind vendors could collaborate to fulfill the cafeteria's purpose of providing food.").

Mot. 9-10.

Id. at 10.

Id. at 10-11.

See Ord. 30; Mot. 10; see also United States v. Texas , 507 U.S. 529, 535 n.5, 113 S.Ct. 1631, 123 L.Ed.2d 245 (1993) (stating that subsequent legislative history is a "hazardous basis" for determining congressional intent).

See Tex. Clinical Labs, Inc. v. Sebelius , 612 F.3d 771, 775 (5th Cir. 2010).

Id.

See generally Op. Letter.

Christensen v. Harris Cty. , 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000).

Id.

Skidmore v. Swift & Co. , 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

Luminant Generation Co., LLC v. U.S. E.P.A. , 675 F.3d 917, 928 (5th Cir. 2012) (citing Mead, 533 U.S. at 234-35, 121 S.Ct. 2164 ).

Skidmore , 323 U.S. at 140, 65 S.Ct. 161.

Id.

See Christensen v. Harris Cty., 529 U.S. 576, 587, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000) (explaining that opinion letter does not warrant Chevron deference, but is only persuasive to the extent of its "power to persuade").

Op. Letter 1.

Id.

Id.

Id.

See id. at 1-2.

Case No. RS/15 -15 (May 9, 2017), https://www2.ed.gov/programs/rsarsp/arbitration-decisions/r-s-15-15.pdf.

Op. Letter 1-2.

Id. at 31.

Reply 4.

Id. at 5.

See Resp. 8 (explaining that the ED noted that some contracts would be limited to discrete tasks and the RSA would not apply to such contracts).

See id. (describing this particular contract as a "complete DFA contract," warranting the application of the RSA).

See 20 U.S.C. § 107a ; 34 C.F.R. §§ 395.1 -395.38.

See generally Op. Letter.

See 20 U.S.C. § 107(a).

See Ord. 20 ("On one hand, the word "operate" could be read to include all necessary tasks to the functioning of a cafeteria."); Op. Letter 1 ("The term operation in the Act means that the vendor must "manage" or "direct the working of" the cafeteria").

Ord. 33.

Op. Letter 1.

State of Kansas, Department of Children & Family Services v. United States Department of the Army, Fort Riley , Case No. RS/15 -15, at 31 (May 9, 2017), available at https://www2.ed.gov/programs/rsarsp/arbitration-decisions/r-s-15-15.pdf

Id. at 25.

Id.index="157" url="https://cite.case.law/citations/?q=20%20U.S.C.%20%C2%A7%20107"> at 25-26 (emphasis in the original).

ECF No. 22-3, Performance Work Statements 1, Ex. 5.

Id. at C.5.1.1.

Id. at C.5.1.6.1.

Id. at C.5.1.6.3.

Id. at C.5.2.2.3.

Op. Letter 1-2.

Reply 9.

Panel Dec. 7 ¶ 17.

Id.

Id. at 8 ¶ 24.

Mot. 12.

Op. Letter 1.

Mot. 12.

See State of Kansas, Department of Children & Family Services v. United States Department of the Army, Fort Riley , Case No. RS/15 -15, at 31 (May 9, 2017), available at https://www2.ed.gov/programs/rsarsp/arbitration-decisions/r-s-15-15.pdf

61 Fed.Cl. 20, 28 (2004).

Mot. 12.

Miss. Dep't of Rehab. Servs. , 61 Fed.Cl. at 28.

Id.

Id.

Id. (acknowledging that prior cases had "not clearly addressed the issue of what constitutes the 'operation' of a cafeteria ... when the RFP ... contracts out some, but not all, of those duties we would ordinarily ascribe to the 'operation' of a cafeteria.").

Id.

20 U.S.C. § 107(a).

Mot. 16.

Resp. 6.

Id. at 12.

Id.

Reply 9.